UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ANDREA PALMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CV1276 CDP |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Andrea Palmer's application for disability

insurance benefits under Title XVI of the Social Security Act. 42 U.S.C. §§ 1381

*et seq.* Palmer claims she is disabled because she suffers from a combination of

impairments, including degenerative disc disease, depressive disorder, seizure

disorder, myofascial pain syndrome, and psychogenic pain. After two hearings,

the Administrative Law Judge concluded that Ross was not disabled. Because the

ALJ did not make sufficient findings about the nature and severity of Palmer's

muscle pain, and because he applied the wrong legal standard in assessing the

opinions of Palmer's therapists, I will reverse and remand.

# I.    Procedural History

Palmer filed her application for disability insurance benefits on November 14, 2008, alleging a disability onset date of April 25, 2007.  When her application was denied, she requested a hearing before an administrative law judge.  She then appeared, with counsel, at two hearings that took place June 8, 2010 and April 19, 2011.  Palmer testified at each hearing along with a vocational expert.  A medical expert also testified at the second hearing.

After the hearings, the ALJ denied Palmer's application, and she appealed to the Appeals Council.  On May 22, 2012, the Council denied her request for review.  The ALJ's decision thereby became the final decision of the Commissioner.  *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Palmer now appeals to this court.  She argues that (1) the ALJ failed to properly consider all of her impairments, including myofascial pain syndrome and psychogenic pain; (2) the ALJ failed to properly assess her credibility because, among other things, he failed to consider the possibility that her mental impairment aggravated her perception of pain; and (3) the ALJ misstated the law governing the weight given to opinion evidence from mental health providers and failed to properly consider opinion evidence from her treating therapists.

## II. **Evidence Before the Administrative Law Judge**

### *Medical Records*

Medical records before the ALJ indicated that Palmer began experiencing back pain in 2002 after a motor vehicle accident, but the pain remained stable until she fell backward from a bus and hit her head and back on April 10, 2007.

After the fall, Palmer sought emergency care at Saint Louis University Hospital. X-rays were generally unremarkable, but she was prescribed rest and various medications, including ibuprofen, hydrocodone, and cyclobenzaprine.

At a follow-up examination April 16, 2007, Dr. Ashokkumar Patel of Concentra Medical Centers noted Palmer had a full range of motion, but moved slowly and indicated pain in her left paravertebral muscle. At a physical therapy session two days later, Palmer reported pain exacerbated by rolling over in bed and climbing stairs. The therapist noted that her ambulation and transitional movements were guarded and that her range of motion was "severely limited."

Palmer had several more physical therapy sessions and follow-up visits with Dr. Patel in April and May 2007. Each time, Dr. Patel indicated that Palmer had a full range of motion, but only with pain. On April 30, 2007, Dr. Patel wrote Palmer a note limiting her to sedentary work. A week later, Dr. Patel wrote that Palmer had been "working within the duty restrictions" and had been "taking [her] medications and has noted improvement." He advised her to continue taking

ibuprofen and cyclobenzaprine and doing daily stretching exercises. Dr. Patel assessed Palmer's condition as lumbar, thoracic, and cervical strain.

In August 2008, a few months after her mother had died, Palmer went to Hopewell Center for an intake assessment. She was diagnosed with bereavement and depressive disorder of "enduring chronicity" and assigned a GAF of 43. She continued to visit counselors at Hopewell Center regularly through at least March 2011.

On September 2, 2008, Palmer was referred to Dr. Nicole Delsoin at the Myrtle Hilliard Davis Comprehensive Health Centers (MHDC) for her back pain. According to medical records, Palmer reported pain at a level of 10 out of 10. In treatment notes, Dr. Delsoin wrote that Palmer had "no apparent limitation in her movements or gait. Has no problems climbing up on the examining table." During an examination of Palmer's back, Dr. Delsoin noted there was no costovertebral angle tenderness. She diagnosed Palmer with low back pain and referred her to Dr. Hagop Tabakian of Creative Solutions in Pain Care.

On September 12, 2008, Dr. Tabakian stated that Palmer's back pain was "localized to the lower back area, worse on the right side compared to the left with no radiation to the lower extremities. It is described as sharp shooting pain across the back, worse with activity but constant even at rest." He noted her gait was "slow, deliberate, but she did not have any limping." He wrote that Palmer

reported that the pain woke her up at night and that she had difficulty sleeping on her right side. Dr. Tabakian diagnosed Palmer with lumbar facet joint arthritis[1] and lumbar spondylosis[2] without myelopathy. Palmer underwent joint blocks at the lumbar level and was prescribed tramadol.

At a follow-up visit on September 29, 2008, Dr. Tabakian diagnosed Palmer, additionally, with lumbar degenerative disc disease. He noted tenderness on palpation of her lumbar facets. In his treatment records, he wrote that Palmer "had almost complete pain relief for about a week after the first lumbar epidural steroid injection." Palmer underwent bilateral joint blocks again.

At another visit two weeks later, on October 13, 2008, Palmer rated her pain at a seven or eight out of ten. Dr. Tabakian noted that she had "significant sensitivity to touch" and added diagnoses of myofascial pain syndrome[3] and

---

[1]  Facet joints are "tiny joints" on each side of the vertebrae in the spine. UCLA Spine Center, "Facet Joint Arthritis," http://spinecenter.ucla.edu/body.cfm?id=120 (last visited July 12, 2013). Arthritic changes to the facet joints can cause "the nerves to the facet joints [to] convey severe and diffuse pain." *Id.* Patients with facet joint arthritis "often complain of pain in a generalized, poorly defined region of the neck or back. Pain is usually worsened by sudden movements or prolonged episodes of poor posture." *Id.*

[2]  Stiffening or fixation of a vertebra, "often applied nonspecifically to any lesion of the spine of a degenerative nature." Stedman's Medical Dictionary 1456 (25th ed. 1990).

[3]  "Myofascial pain is a localized condition that can affect any skeletal muscle and can cause such manifestations as tenderness, local or referred pain, stiffness, and muscle weakness without atrophy. Discomfort arises from referred pain and muscle dysfunction caused by trigger points, [which are] tight bands of skeletal muscle with palpable nodes." Samuel Hodge et al., Small Circles of Pain Cause Big Headaches in Court – A Primer on Myofascial Pain & Trigger Points, 15 Mich. St. U. J. Med. & L. 71, 72 (2010) (brackets and internal quotations omitted).

radiculopathy.[4]  He gave Palmer a prescription for a Lidoderm patch and hydrocodone, noting that she could "resume her daily activities," and scheduled a follow-up visit for November 24, 2006.  At that visit, Dr. Tabakian wrote that, per Palmer's report, the facet joint blocks had "decreased the pain significantly down to 1-2 on a scale of 0-10," but the pain had come back.  Examination showed bilateral facet joint tenderness, right more than left.  Dr. Tabakian noted that Palmer was a candidate for rhizolysis.[5]

On December 9, 2008, Palmer underwent radiofrequency rhizolysis on her right side, at lumbar facets L3-4, L4-5, and L5-S1.  She was diagnosed again with lumbosacral spondylosis.  Palmer was advised to rest for one day, apply ice packs on and off for 48 hours, avoid weight-bearing and strenuous activity, and "increase activity as tolerated."  The following month, on January 20, 2009, Palmer had the same procedure done on the left side.  She was advised not to lift over 20 pounds.  The procedure was later repeated, in June 2009 on the right, and in September 2009 on the left.

Palmer saw Veronica Rice, a qualified mental health provider at Hopewell Center, on December 8, 2009.  At that point, Palmer had been seeing Rice and

---

[4]  Disease of the spinal nerve roots.  Stedman's Medical Dictionary 1308 (25th ed. 1990).

[5]  Rhizolysis (or rhizotomy) is the sectioning "of the spinal nerve roots for the relief of pain or spastic paralysis."  Stedman's Medical Dictionary 1360 (25th ed. 1990).  *See also Dorland's Illustrated Med. Dict.* 1666 (31st ed. 2007) (an "interruption" of the nerve root).  It is described as the surgical "de-nerving" of the facet joint. See http://my.clevelandclinic.org/.

other counselors for more than a year. According to a progress note, Palmer reported that she needed medicine because she had been stressed out. Rice assigned a GAF of 50 and noted an Axis I diagnosis of depressive disorder NOS. She deferred diagnosis on Axis II. Palmer was prescribed Seroquel and Celexa at that time.

On January 15, 2010, Palmer saw Dr. Tabakian again. He noted that her pain had "worsened slightly." According to treatment records, samples of Amrix had relieved Palmer's pain, but her insurance did not cover it. Dr. Tabakian suggested Flexeril as an alternative. Two months later, at a follow-up visit, Dr. Tabakian wrote that the cold weather had been causing Palmer a lot of muscle pain, but it was responding to Flexeril. She was not experiencing side effects or disturbed sleep. An examination revealed tenderness of Palmer's lumbosacral paravertebral spaces.

On May 7, 2010, Palmer saw Dr. Gina McCrary Smith at MDCH. Dr. McCrary Smith assessed Palmer as having rhinitis, depression, and an anxiety disorder NOS.

Medical records from May and June 2010 show that Palmer went to regular appointments with counselors Rice and Leepi Khatiwada at Hopewell Center. Khatiwada noted that Palmer reported seeing and hearing things "every now and

then." Palmer reported that "people always get into my damn nerves and I do not know the reason why."

On June 15, 2010, Dr. McCrary Smith assessed Palmer as having a rheumatologic disorder, arthropathy, localized osteoarthritis of the vertebral column, and bilateral leg pain. The following month, medical records from St. Mary's Hospital indicate that Palmer was taking Seroquel, Celexa, Flexeril, and Vicodin, and she was also using Lidoderm patches.

On October 8, 2010, Palmer saw Dr. Rolf Krojanker and counselor Rice at Hopewell Center. Dr. Krojanker noted that Palmer was out of medications, suffered from backache and headache, and sat "tensely." In his treatment notes, Dr. Krojanker wrote, "In my view, the patient needs probably some additional psychotherapeutic relief and I suggested to her Emotions Anonymous." During her session with Rice, Palmer reported that she had missed her most recent appointment because "she was in so much pain that she couldn't get out of bed." Palmer also reported sleeping poorly at night. At a later appointment in December 2010, Rice wrote:

> Client reports today that her back is hurting really, really bad. . . . Client looked sad today; her glance was downcast and she didn't smile at all during the session. Client said her mood is depressed today and she is very irritable but she doesn't know why. Client did say she wanted to get home as soon as possible.

At follow-up appointments in October and November 2010, as well as January 2011, Dr. McCrary Smith conducted musculoskeletal reviews and found that Palmer had muscle aches, joint pain, and joint stiffness. Dr. McCrary Smith diagnosed Palmer with lumbar strain and arthropathy. At the time, Palmer was taking naproxen, Neurontin, Flexeril, hydrochlorothiazide, and Tylenol with codeine, as well as some medications for allergies and sinus problems.

Palmer underwent an X-ray of her thoracic and lumbar spine on November 16, 2010. The X-ray revealed minimal scoliosis concave to the left of the thoracic spine, as well as minimal S-shape lumbar scoliosis concave to the right of the upper lumbar spine and concave to the left of the lower lumbar spine. Palmer also underwent an X-ray of her lumbosacral spine the following summer, on June 20, 2011. It showed small anterior hypertrophic spurs in two of Palmer's vertebrae.

On January 25, 2011, a progress note from counselor Rice at Hopewell Center indicates that Palmer was "sad." Rice wrote that she "listened as client cried and vented about the ongoing pain she is in from her back. Client lamented about not being able to do the things she used to do or not do like she wants to because of her pain." According to the progress note, Palmer reported that "her back went out and she couldn't walk for two days. The lumbar nerves in her back became inflamed. Her doctor burns off the nerve ends that are inflamed, but they grow back within six months to a year."

On January 28, 2011 and again on March 13, 2011, Palmer sought care at Saint Louis University Hospital after seizures.

### *Psychiatric Review Technique*

On December 5, 2008, state psychiatrist Kyle DeVore completed a psychiatric review technique. He assessed Palmer's impairments of depressive disorder and bereavement to be severe but not expected to last twelve months. Dr. DeVore concluded that Palmer "showed great improvement" despite the fact that she did not comply with treatment, and that she had a strong history of unreliable reporting. He found Palmer to be "partially credible at most." He found insufficient psychological evidence from April 2007 to August 2008 to make an assessment.

### *Consultative Examinations on October 10, 2010*

On October 10, 2010, Palmer underwent an consultative medical examination at Medex. Dr. Austin Montgomery reported that Palmer was "in no apparent distress until we start range of motion or until I touch her." He noted that her range of motion in her neck was slightly limited, and that she had pain in her right abdomen, in her lumbosacral area, and in the right costovertebral area. Dr. Montgomery also reported that Palmer had weakness on her right side with her upper and lower extremities and with her grip. Her straight leg raising was limited. He wrote:

> She got on and off the examination table with fairly apparent ease, however, when I asked her to walk it was a decidedly marked waddling gait. She said sometimes she did have a limp. Station was normal on the table. She could not walk on her toes or heels. She could not squat. When asked to do these things she appeared to have poor balance and reached for furniture. . . . It seemed to me that everything was exaggerated.

Dr. Montgomery gave a clinical impression of chronic back pain post-op rhizolysis bilaterally in lumbar area; weakness on right side in the upper and lower extremities; and hypertension.

Palmer underwent a consultative psychological evaluation on the same day. Dr. Bridget Graham noted that Palmer had begun counseling at Hopewell Center after her mother died, and that Palmer met with a counselor twice per month and with a psychiatrist every one to three months. According to Dr. Graham's notes, Palmer reported that her medications were working and that she had not attempted suicide or self-harm. Dr. Graham wrote:

> Without medications the claimant indicated that she is very moody, cranky, and irritable. She endorsed frequent crying spells, increased sleep, feeling hopeless, helpless, and worthless. The claimant indicated that when her depression becomes very bad she begins to isolate and withdraw from those around her. . . . The claimant is able to manager her own funds, understand and remember multi-step instructions, and sustain concentration, persistence, and pace. Her ability to interact socially is good. There was no evidence that she would not be able to adapt to another workplace environment.

Dr. Graham assessed a GAF of 70 and diagnosed Palmer with depression not otherwise specified.

### *Function Report*

Palmer completed a function report on December 1, 2008. She stated that she could no longer walk, run, jump, sit, stand, climb stairs, kneel, lift, squat, reach, or bend over like she could before her back pain began, and that the pain affected her sleep. She could walk five minutes without resting but would need a 25-minute rest upon stopping. She attended church every Sunday. Palmer reported no problems getting along with others, paying attention, following spoken instructions, handling stress or changes in routine.

Palmer also reported no problems with personal care. She wrote that she did not usually prepare her own meals usually but did so "once or twice," and that her pain made her unable to stand too long. She reported that she could do some laundry, for an hour or an hour-and-a-half twice per week, but she had to "sit down for 15 minutes" and needed help because she could not bend over.

Palmer wrote that she shopped for food and that it took her three-and-a-half hours. She would pay bills only when her daughter was with her, and she did not have a bank account.

### *Medical Source Statements*

Thomas Irwin, a Hopewell counselor Palmer had seen several times, filled out a medical source statement on January 4, 2010. He assigned Palmer a GAF of 50. He noted diagnoses of depressive disorder NOS, back problems, and family

and financial stressors.  He did not respond to a question about whether Palmer could do sedentary work.

On October 11, 2010, a few days after examining Palmer, consultative examiner Dr. Graham also completed a medical source statement.  She assessed Palmer as having mild limitations in each of the six work-related areas of functioning: understanding and remembering simple instructions; carrying out simple instructions; the ability to make judgments on simple work-related decisions; understanding and remembering complex instructions; carrying out complex instructions; and the ability to make judgments on complex work-related decisions.  Dr. Graham noted that, when Palmer was unmedicated, her symptoms "could interfere somewhat with her ability to function."  However, Dr. Graham found that Palmer's impairments did not affect her ability to interact appropriately with supervisors, co-workers, or the public.

Counselor Veronica Rice completed a similar assessment on January 26, 2011.  Rice wrote that Palmer had fair ability to follow work rules, relate to co-workers, and function independently, but poor to no ability to deal with the public; use judgment; deal with work stress; concentrate; interact with supervisors; behave in an emotionally stable manner, relate predictably in social situations; and demonstrate reliability.  Rice wrote that Palmer "continues to be depressed, irritable [with] insomnia and internal anger. She can't sit in one position longer

than ten minutes due to chronic back pain. [Palmer] had seventeen surgeries on her back and is facing another one." Rice found that Palmer was "not able to engage in full time work at this time." She wrote that Palmer "continues to be depressed and has to be monitored by her family very closely" because she had almost overdosed on her medications. Rice assessed Palmer a GAF of 45 and diagnosed her with bipolar disorder and a bulging disc.

On February 7, 2011, treating physician Dr. McCrary Smith also filled out a medical source statement. She diagnosed Palmer with chronic mid/low back pain, lumbago, and thoracic and lumbar scoliosis. She assessed that Palmer was unable to stand longer than two or three hours without pain and was unable to sit more than two or three hours without changing positions.

### *Testimony Before the ALJ at the June 8, 2010 Hearing*

At the first hearing, Palmer testified that she was 46 years old and lived with her daughter and granddaughter. She had graduated from high school. In 1997, she completed a certificate program in cosmetology. She also had earned her 16-hour certified medical technician license, but she had not worked in either of those fields. Palmer testified that she had been employed in janitorial services, food service, and housekeeping. Most recently, she had worked as a bus monitor.

Palmer testified that on April 10, 2007, she fell backward off a bus, hit her head and back, and fell unconscious. She received numerous back treatments

afterward, including rhizotomy twice on each side of her back, epidural steroid injections, Lidoderm patches, and various medications, including hydrocodone and cyclobenzene. She took her medications as prescribed. She testified that the rhizotomy was not helpful, but that the injections helped a little. She also stated that she had done physical therapy, but it made her back worse. Her doctor was planning for her to have additional rhizotomy procedures on each side of her back.

Palmer also testified that her days generally began at 5:30 in the morning. On some days, she would go sit with a friend and fish for catfish at Fairground Park. She stated that it took about ten minutes to walk from the parking lot to the fishing site. She would sit and clean the fish she caught. During the winter, however, she would just "keep doctors' appointments and try to relax." She testified that she did not drive, cook, or go grocery shopping, but she would boil water and try to stand to wash dishes, and that she crocheted. She stated that she could make her bed and "just lay across [her] bed and watch TV." Palmer testified that she tried "not to do too much extreme work because it causes pain on [her] back."

Palmer testified that the heaviest thing she could lift was her shoes; she could not lift a gallon of milk. She could sit or stand comfortably for approximately one hour, and she did not have trouble feeding herself or putting on her shoes. She did, however, have problems bathing most of the time. She also

stated that she had problems bending forward at the waist, which caused pain to "shoot straight up the center of [her] back." Twisting and squatting had the same effect.

On a day-to-day basis, the pain Palmer experienced without medication was an eight on a scale of ten. She testified that her pain level decreased to six when she took her medications. She stated, however, that her medications made her sleepy.

Palmer stated that she attended church weekly, and that she also left the house to take the trash out and to go to the doctor. Palmer did not leave the house to visit friends or take trips. She had missed family reunions, and the last time she had left town was to bury her mother in May 2008.

After her mother's death, Palmer began going to the Hopewell Center for counseling and other mental health services. She was prescribed Seroquel and Citalopram, which also made her sleepy. Palmer also testified that she was moody, cried constantly, and was often frustrated. She stated that her counselor told her some of those symptoms were caused by her pain. She had no problem socializing with others, although she stated sometimes she was teary in front of others and they would ask her what was going on. She testified that she would tell others she was in a lot of pain and they would advise her to go home. Palmer testified that her pain caused her anger, frustration, and a lack of focus.

Palmer stated that she had "some of those days" each month where she was virtually bed- and bathroom-bound. She testified that she was incapacitated in this way about 12 or 13 days per month.

### *First Vocational Expert's Testimony*

A vocational expert, James Israel, also testified at the first hearing. The ALJ asked Israel to consider a hypothetical individual with Palmer's age, education, and work experience who could lift 20 pounds occasionally and 10 pounds frequently; stand, sit, and/or walk six hours in an eight-hour day; occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, and scaffolds; avoid concentrated exposure to extreme cold, whole-body vibration, unprotected dangerous heights and dangerous machinery; and only perform simple and/or repetitive work. Israel found that all of Palmer's past work would be precluded for various reasons. However, he testified that the individual could perform jobs as a food sorter, manual packer, or assembler of small component parts.

The ALJ then asked Israel to consider the same hypothetical but to reduce the exertional level to sedentary, the maximum weight lifted to 10 pounds, and the stand/walk capacity to two hours in an eight-hour day. Israel testified that an individual limited in those ways could work as a sit-down assembler or inspector, as well as a food order clerk. However, if that person would miss more than two

days per month for medical reasons, that would preclude competitive employment after a brief period. If that person would unpredictably show up late or leave early, at least once per week, that would also preclude competitive employment.

In response to a question from Palmer's attorney, Israel testified that a person unable to sit for two hours per day, cumulatively, would not be able to work at a sedentary-level job.

Palmer's attorney also questioned Israel about how a Global Assessment Functioning score affects a person's ability to gain and keep employment. Israel testified that he would have to know how the symptoms leading to a GAF score manifest functionally in a particular person. He categorized a GAF below 50 as "severe" if it persists. Israel testified that the interpersonal problems, mood disorders, and crying spells the score represents can reach "a threshold of frequency, intensity, and duration" that are "often associated with non-job retention." He cautioned, though, that this may only be if the symptoms manifest at work.

### *Testimony Before the ALJ at the April 19, 2011 Hearing*

The ALJ held a supplemental hearing to collect more information about Palmer's functional ability. In addition to Palmer, a vocational expert and a medical expert both testified.

At the second hearing, Palmer testified that she still experienced pain in her low back that felt like pins sticking her, and the pain had worsened since the last hearing. She stated that she was sometimes able to control the pain with medication, but sometimes the pain was too severe and she would have to lie down. Sitting, standing, and bending exacerbated her pain, but she also experienced pain lying down. She could not make it through a day without lying down. Once per month or so, Palmer would have difficulties bending over to tie her shoes or reaching over her head to put on her shirt. She testified that she could walk from the front door to the back door without stopping to rest, could stand for about two minutes without sitting, and could sit for an hour without lying down.

Palmer testified that she took acetaminophen with codeine, naproxen, and cyclobenzaprine, and that her prescription of Neurontin had been discontinued because it caused her seizures. She took Keppra to prevent seizures.

Palmer testified that she continued to go to Hopewell Center for counseling and had just been prescribed Oleptro. She stated she felt depressed "most of the day," had trouble concentrating, remembering, completing tasks, and sleeping at night. Palmer described a neighborhood barbecue she had recently attended and how she had started to weep there. She stated that she had four or five crying spells per day, and that when she was under stress, she would cry, get frustrated, throw things, and have seizures. She testified that her seizures were currently

under control.  She stated that she had not tried to look for lighter work since she left her bus monitor job in 2007 because she had "been in too much pain to even try to do anything."

### *Medical Expert's Testimony*

A medical expert, Ann Winkler, also testified.  Dr. Winkler testified that Palmer had "some ongoing psychological problems" and complaints of low back pain.  Dr. Winkler stated that X-rays showed Palmer had minimal degenerative changes in the thoracic and lumbar spine.  Dr. Winkler testified that she found it surprising that Palmer's treating physician had not "done more assessment of what seems to be her major problem."  She said there were no MRIs in the medical treatment records, and she would recommend an MRI be done.

Dr. Winkler stated that Palmer had well-controlled glaucoma and a non-severe hemorrhoid, and that she could not determine how well-controlled Palmer's seizures were.  Dr. Winkler testified that Palmer's physical limitations did not meet or equal any Listings and that she would have to defer to a psychiatrist regarding the severity of Palmer's psychological problems.  She stated that pain could have a psychological element.

When the ALJ asked Dr. Winkler to assess a functional capacity with regard to physical issues, she testified that Palmer would be able to lift or carry at least 25 pounds occasionally, 20 pounds frequently; have no limits on standing, walking or

sitting; and have no manipulative, visual, communicative, or environmental limits except avoiding unprotected heights, ladders, ropes, and scaffolds.

### *Second Vocational Expert's Testimony*

A second vocational expert, Chrisann Geist, testified that Palmer's bus monitor position was the only substantial gainful activity she had engaged in. The ALJ posed the same hypothetical to Geist as he had to Israel, adding that the person could not perform a job requiring close interaction with the public or work around open water or open flame. Geist testified that a person with those restrictions could not be a bus monitor because that position requires working with the public. However, the person could do food preparation, light packing, or light inspections.

Geist also testified that, assuming the person could lift only 10 pounds and could only stand or walk two hours per day, the person could still engage in sedentary packing or simple assembly. If the person had to change position every two to three hours, there would still be some inspection, assembly, and packing jobs available in the local economy.

Like Israel, Geist testified that if that person would miss two or three days of work per month for medical reasons, or would unpredictably arrive late or leave early, that person would be precluded from engaging in competitive employment. Geist also testified that if the person had no useful ability to deal with the public,

use judgment, deal with work stresses, or interact with supervisors, that person could not sustain full-time employment.

## III.    **Legal Standard**

This court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *Rucker v. Apfel*, 141 F.3d 1256, 1259 (8th Cir. 1998).  "Substantial evidence" is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion.  *Id.*  When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005), or because the court would have weighed the evidence differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon

a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

Social security regulations define disability as the inability to engage in any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months.  42

U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20

C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to

evaluate the claim based on a five-step procedure.

First, the Commissioner must decide whether the claimant is engaging in

substantial gainful activity.  If so, she is not disabled.

Second, the Commissioner determines if the claimant has a severe

impairment which significantly limits the claimant's physical or mental ability to

do basic work activities.  If the impairment is not severe, the claimant is not

disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates

whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work.  If the claimant can perform past relevant work, she is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether she can perform other work in the national economy.  If not, the claimant is declared disabled.  20 C.F.R. § 404.1520; § 416.920.

### *ALJ Decision on May 12, 2011*

After the supplemental hearing, the ALJ found that Palmer had the severe impairments of degenerative disc disease of the lumbar spine, depressive disorder, and a seizure disorder.  Relying in part on the medical expert's testimony as to Palmer's physical impairments, the ALJ found that those impairments did not, individually or in combination, meet or medically equal those listed in 20 C.F.R. Part 404, Subpart P, App. 1.  The ALJ also held that Palmer's depressive disorder did not satisfy the listing for affective disorders because it did not lead to marked mental functional limitations in at least two areas of mental functioning.  He held that the evidence did not support a finding that Palmer's seizures were severe or frequent enough to prevent her from sustaining a normal work schedule.

The ALJ found that Palmer had the residual functional capacity necessary to perform light work, except that her impairments precluded her from lifting more than 10 pounds frequently and 20 pounds occasionally; standing or walking for more than six hours in an eight-hour workday; sitting for more than six hours in an eight-hour workday; climbing ladders, ropes, scaffolds, ramps, or stairs; stooping, kneeling, crouching, or crawling more than occasionally; or being exposed to hazards or whole-body vibration. He also found that Palmer could perform only "simple, routine work with no close interaction with the public."

The ALJ held that the limitations on Palmer's RFC prevented her from performing her past relevant work as a bus monitor. However, relying on the testimony of vocational expert Geist and the Dictionary of Occupational Titles, the ALJ found that Palmer could perform certain unskilled, light jobs, including food preparation worker, packer, and inspector. He concluded that these jobs existed in significant numbers in the local and national economies.

The ALJ found that Palmer's allegation that she was not capable of any substantial gainful activity was not credible "because of significant inconsistencies in the record as a whole." He noted that her work history detracted from her credibility because she had "never worked on more than a sporadic basis and ha[d] never demonstrated a consistent motivation to work." The ALJ held that Palmer's daily activities, including her ability to provide for her own care, perform light

household chores, attend church, and fish, were inconsistent with her allegations of disabling symptoms and limitations. He noted that there was no lay witness testimony to support Palmer's allegations of disability.

The ALJ also held that Palmer's subjective complaints were not consistent with or supported by the medical evidence. The ALJ wrote that Palmer underwent "minimal or conservative treatment" that was "inconsistent with the allegation of a disabling impairment," and that there was no evidence that her prescribed medication was ineffective or caused side effects. He noted that Palmer did not use an assistive device for walking and that physical examinations revealed an ability to ambulate independently, with a normal gait. The ALJ also mentioned that Palmer "did not appear in any obvious credible discomfort" during the hearing, and that no other lay testimony independently supported her allegations.

In addition, the ALJ found that Palmer's depressive disorder had not required emergency intervention or psychiatric hospitalization, and that her mental condition appeared "generally controlled and stable with compliant prescribed therapy."

Regarding Palmer's physical limitations, the ALJ gave great weight to medical expert Winkler and her assessment of Palmer's RFC. He afforded less weight to treating physician Dr. Patel, finding that Palmer's impairments were "more limiting" than Dr. Patel had concluded. Finally, the ALJ afforded little

weight to Dr. McCrary Smith's conclusion that Palmer could only perform sedentary work with a sit/stand option.  The ALJ found that Dr. McCrary Smith's conclusion was inconsistent with her own treatment records, and that the medical source statement she completed was on a pre-printed questionnaire; did not articulate an objective medical basis; and was unsupported by the evidence as a whole, including Palmer's daily activities.  He noted that the statement appeared to be based on Palmer's "subjective complaints, rather than on independent medical findings."

Regarding Palmer's mental limitations, the ALJ relied upon the opinion of Dr. DeVore, who had completed a psychiatric review technique in 2008.  The ALJ characterized Dr. DeVore's report as limiting Palmer to "simple work activity with limited social contact."  The ALJ rejected the conclusion of examining psychologist Dr. Graham, who had determined Palmer's depressive disorder was not severe.  The ALJ gave little weight to the opinions of counselors Rice and Irwin, who had each assessed Palmer as having a low GAF score.  The ALJ noted that, as a qualified mental health provider and a licensed clinical social worker, respectively, Rice and Irwin's opinions were "other source" opinions entitled to significantly less weight than "acceptable medical source opinions."

# IV.  Discussion

Palmer makes three arguments on appeal.  She argues that (1) the ALJ failed to properly consider all of her impairments, including myofascial pain syndrome and psychogenic pain; (2) the ALJ failed to properly assess her credibility because, among other things, he failed to consider the possibility that her mental impairment aggravated her perception of pain; and (3) the ALJ misstated the law governing the weight given to opinion evidence from mental health providers and failed to properly consider opinion evidence from her treating sources.

## A.  *Consideration of Additional Sources of Pain*

At step two of the sequential evaluation, an ALJ considers whether a claimant has shown that she has a "severe" impairment or combination of impairments.  *See* 20 C.F.R. § 416.920(a)(4); *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  A claimant's impairments are not severe if they amount only "to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Kirby*, 500 F.3d at 707; *see also* 20 C.F.R. § 404.1520(c).

At step four of the sequential evaluation, the ALJ considers all of the claimant's impairments, individually and in combination, to determine whether they have an impact on the claimant's residual functional capacity.  20 C.F.R. §

404.1545(a)(2).  The ALJ must consider the effects of both severe and non-severe

impairments.  *Id.*; *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004).

Here, Palmer argues that the ALJ failed to properly consider all of her

impairments.  She contends that she demonstrated that she suffered from muscle

pain and psychogenic pain, which the ALJ did not take into account when he

determined her residual functional capacity.  Palmer argues that the ALJ based his

RFC determination on his finding of only one source of pain: degenerative disc

disease.  According to Palmer, had the ALJ considered her additional types of pain,

he might have found a more restrictive RFC.  As Palmer points out, "two sources

of pain are likely to cause an individual to experience more pain and functional

restrictions than one source of pain."  I will address each of the additional alleged

impairments in turn.

### 1.    Muscular Pain/Myofascial Pain Syndrome

In the context of a Social Security claim, pain is a symptom, not a

medically determinable impairment.  *See* 20 C.F.R. § 404.1529; SSR 96-7P, 1996

WL 374186 (July 2, 1996) (symptoms like pain alone cannot justify a finding a

disability; there must be objective medical evidence of an impairment "that could

reasonably be expected to produce the symptoms").  However, it is "well-settled

that pain can cause disability within the meaning of the Social Security Act."

*Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991) (quotation marks omitted).

In this case, the ALJ did not distinguish between the types of back pain Palmer experienced. It may be that he considered Palmer's muscle pain when determining that her degenerative disc disease was a severe impairment. For example, in his recitation of the evidence, the ALJ noted that Dr. Patel and Dr. Smith McCrary had both diagnosed muscle strains and that Palmer was routinely prescribed muscle relaxants, including cyclobenzaprine. (L.F., pp. 13, 14, 16, 17.) However, it is unclear whether he took Palmer's muscle pain into account in his RFC determination, either as a symptom of her severe degenerative disc disease or as a symptom of a separate impairment, like muscle strains, arthropathy, myofascial pain syndrome, or facet joint syndrome. (*See* L.F., p. 433–435, 468, 621, 630 (diagnosing those conditions)).

Palmer's treating doctors consistently considered her muscle pain to be a symptom of an impairment separate from her degenerative disc disease. (*See* L.F., pp. 484, 542, 613, 630, 632 (treating doctors diagnosing muscle strains separately from disc disease; Flexeril and Amrix prescribed to treat "muscle pain"), p. 434 (Dr. Tabakian's diagnoses of lumbar radiculopathy and myofascial pain syndrome, in addition to disc disease)). The ALJ, however, did not make a determination one way or the other about the severity of Palmer's muscle pain, whether it stemmed from a separate impairment, and whether it had any effect on her RFC. This prevents me from determining whether substantial evidence supports the ALJ's

decision as a whole. *See Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008).

The Commissioner's reliance on *Johnson v. Apfel*, 210 F. 3d 870 (8th Cir. 2000), and *Nguyen v. Chater*, 75 F.3d 429, 431 (8th Cir. 1996), is misplaced. Those cases apply the unremarkable proposition that an ALJ may properly conclude, at step two, that a claimant has no severe impairment. In his response brief, the Commissioner urges that Palmer's "myofascial pain and muscle strains in her back were not 'severe' impairments." Although that may be true, that is not a determination the ALJ made. He did not determine that Palmer's muscle pain stemmed from a non-severe impairment; instead, he simply did not discuss the muscle pain in any meaningful way.

Accordingly, I will remand for the ALJ to consider whether Palmer's muscle pain is a symptom of a separate impairment, whether that impairment is severe, and whether it has any additional effect on his RFC determination. *See Barton v. Astrue*, 549 F. Supp. 2d 1106, 1121 (E.D. Mo. 2008) (remand required where claimant alleged she suffered from disabling pain and ALJ failed to demonstrate he considered all the medical evidence in support of her claim); *Smith v. Astrue*, 4:08CV1945, at *46 (E.D. Mo. Feb. 2, 2010) (ALJ's failure to discuss claimant's diagnosis of myofascial pain syndrome or list it as a severe impairment was reversible error); *Taylor v. Astrue*, 6:11CV588, 2012 WL 1415410, at *2

(N.D.N.Y. Apr. 24, 2012) (remand required where ALJ failed to mention claimant's wrist impairment at all in discussing severity "and only briefly acknowledged the impairment" in RFC determination); *Moraine v. Soc. Sec. Admin.*, 695 F. Supp. 2d 925, 956 (D. Minn. 2010) (where ALJ made no findings about whether claimant's fibromyalgia was severe, remand was required because court was "unable to review that portion of his decision for error").

2. <u>Psychogenic Pain</u>

Palmer also argues that the ALJ failed to consider the fact that she experienced psychogenic pain.[6] Her argument has two aspects. First, she contends that the psychogenic pain constituted an additional impairment, or perhaps a symptom of an additional impairment, that should have been considered at steps two and four of the sequential evaluation. Although there is some evidence to support Palmer's claim of disabling muscle pain, there is no evidence to support her claim that her psychogenic pain stemmed from an additional impairment or was, itself, an additional impairment. *See Middlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000) (claimant bears burden of establishing she suffers from severe impairment). Though the medical expert acknowledged that pain may have a psychological aspect, the expert did not opine that Palmer experienced

---

[6]  *See Parsons v. Heckler*, 739 F.2d 1334, 1337 (8th Cir. 1984) (psychogenic pain is pain that "cannot be traced to a physical origin"); *Mateer v. Bowen*, 702 F. Supp. 220 (S.D. Iowa 1988) (psychogenic pain is "mentally generated"); Stedman's Medical Dictionary 1285 (25th ed. 1990) (psychogenic is "of mental origin or causation").

psychogenic pain; neither did any of Palmer's treating physicians or mental health providers identify it separately from Palmer's depression or back problems. To the extent that Palmer experienced psychogenic pain, the ALJ properly considered it in his discussion of her depressive disorder. *See* L.F., p. 19 (ALJ's findings of limitations imposed by Palmer's depressive disorder and physical impairments); *Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011) (ALJ properly considers the combined effects of a claimant's impairments when the ALJ separately discusses each impairment and still concludes that the claimant does not have a combination of impairments that render her disabled).

In addition, Palmer contends that her psychogenic pain affected the ALJ's credibility analysis, because the ALJ "failed to examine the possibility that [Palmer's] mental impairment aggravated her perception of pain." I will address this argument in the following section.

**B.**     *The ALJ's Credibility Analysis Is Supported by Substantial Evidence*

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). However, the ALJ may disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990). When considering

subjective complaints, the ALJ must consider the factors set out in *Polaski v. Heckler*, 739 F.2d 1320, 1321–22 (8th Cir. 1984), which include "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010); *see also Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011).

An ALJ is not required to explicitly discuss each *Polaski* factor. *Buckner*, 646 F.3d at 558. Further, the "credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Holmostrom v. Massanari*, 270 F.3d 715, 721 (8th Cir.2001). Consequently, courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so. *Buckner*, 646 F.3d at 558.

Here, the ALJ found Palmer's allegation of disability to be not credible. In support of his finding, he relied upon medical examinations showing she had normal gait and was able to walk independently; that she was in no obvious distress during the hearing; and that she was "able to live and function independently, provide care for her own care, perform light household chores, attend church, and fish." To the extent Palmer's activities were restricted, the ALJ wrote, "they appear restricted mainly as a matter of choice, rather than any apparent medical prescription." (L.F., p. 17.) The ALJ also pointed out that

Palmer had "never worked on more than a sporadic basis, and has never demonstrated a consistent motivation to work"; that there was no evidence her medications were ineffective; that she had opted for "minimal or conservative treatment"; and that her mental condition was "generally controlled and stable with compliant prescribed therapy."

The ALJ also relied in part on the fact that a drug screen showed a negative result for opiates, though Palmer testified that she took hydrocodone at some point. Though he gives a different date, the drug screen the ALJ cites actually took place on January 29, 2011. (L.F., p. 671.) Palmer did not testify that she was taking hydrocodone at that time. A medication list prepared by Dr. McCrary Smith of MDCH on January 13, 2011 did not include any opiates; nor did a medication list prepared by Dr. Veronica Cross of MDCH at a family planning visit on January 19, 2011. The treatment records indicate that she took different medications at different times, depending on what each treating doctor decided to prescribe. Further, as Palmer points out in her brief, the drug screen took place at nearly midnight when Palmer sought emergency care after a seizure. Even if she had been prescribed hydrocodone in January 2011, the ALJ did not discuss what time Palmer took her medication and how long it would remain in her system. Therefore, the negative drug screen should have had no bearing on the ALJ's assessment of Palmer's credibility.

Further, Palmer's daily activities do not support the ALJ's adverse credibility finding. She testified that she had good days and bad days, and that some days she spent the whole day in bed. Fishing, as described by Palmer, meant that a friend picked her up in a car and together they made a ten-minute walk to Fairground Park, where she sat for two hours. This activity is not necessarily inconsistent with disability. *See Ross v. Apfel*, 218 F.3d 844, 849 (8th Cir. 2000) (where claimant's pain level varied and he had good and bad days, "sitting on a fishing boat" was a limited activity that did not prevent finding of disability). Though the ALJ characterized Palmer as being able to "do light housework," she actually testified that she would "try to stand and wash the dishes," boil water, make her bed, and take out the trash. She cleaned fish that she caught, but did not cook them; instead, she would sit and describe for her family members what to do. Palmer testified that she tried to fix herself "something to eat, but it hurts so bad sometimes I have to sit there in a chair to fry an egg." In her 2008 function report, she also described doing laundry for up to three hours per week, but needing rest and help because it hurt to bend over. Though Palmer could dress and feed herself, she could not lift a gallon of milk and she "ha[d] problems most of the time with . . . bathing." As reported, Palmer's daily activities were not inconsistent with a finding of disability. *See Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005) (fact that claimant engaged in some "light exertional activities," such as laundry,

grocery shopping, and household chores, was "not inconsistent with her complaints of pain, and in no way direct[ed] a finding that she [was] able to engage in light work"); *see also McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc).

Despite the fact that Palmer's negative drug screen and daily activities did not support the ALJ's finding of non-credibility, there is still substantial evidence to support the ALJ's finding. *Nicola*, 480 F.3d at 886. He examined Palmer's work record; the dosage, effectiveness, and lack of significant side effects of her medication;[7] the lack of functional restrictions imposed on Palmer by her doctors; the lack of ambulatory assistance she needed; the lack of independent lay testimony supporting her allegations;[8] and treatment records showing no abnormalities in Palmer's gait or range of motion. This is sufficient to support his finding that Palmer's testimony about her disabling pain was not credible. *See Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (court should not disturb an ALJ's finding if it falls within the available "zone of choice").

However, I agree with Palmer that the identification of her muscle pain as a separate impairment – or a symptom of a separate impairment – may affect the

---

[7] Palmer argues that she testified that her medications caused sleepiness and that she took naps during the day. The ALJ acted within his "zone of choice," *Hacker*, 459 F.3d at 936, in determining that this was not a significant side effect that precluded all employment.

[8] Palmer also argues the ALJ disregarded a note from a Social Security examiner stating that Palmer stood and stretched during her Social Security interview, and complained of back pain. The ALJ could have properly disregarded this note as based on Palmer's subjective complaints.

ALJ's evaluation of her credibility.  Therefore, upon remand, the ALJ should reconsider Palmer's credibility in light of the findings he makes about her muscle pain.

**C.**     ***The ALJ Misstated The Law Related to "Other Medical Sources" and Improperly Discounted Counselors' Opinions***

Palmer argues that the ALJ failed to give enough weight to the opinions of Veronica Rice and Thomas Irwin, qualified mental health providers and Palmer's counselors at Hopewell Center.  Palmer seems to suggest that, under Social Security regulations, Rice and Irwin are "treating sources" whose opinions are sometimes entitled to controlling weight.  *See Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003) (citing 20 C.F.R. § 404.1527(d)) ("A treating source's opinion is to be given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record.").  This is incorrect.  Only an "acceptable medical source" can be considered a treating source.  *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d) and 416.927(d)).  A therapist, no matter how involved in a patient's care, is an "other medical source." *Id.*

However, the Social Security Administration has specifically addressed the value of opinions from other medical sources.  *See* SSR 06-3p, 71 Fed. Reg. 45,593 (Aug. 6, 2007).  In its 2006 ruling, the SSA explained that nurse

practitioners, social workers, and others "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." As such, opinions from other medical sources, like therapists, "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* (quoted in *Sloan*, 499 F.3d at 888–89.)

Under Eighth Circuit law, it may even sometimes be appropriate for the opinion of an "other medical source" to outweigh the opinion of a treating source, if the other source "has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." *Sloan*, 499 F.3d at 889. In general, when weighing the opinion of an "other medical source," an ALJ should consider the length of time and frequency of the claimant's visits with the source; the consistency of the source's opinion with other evidence; the evidence and explanations supporting the source's opinion; the source's specialty; and "[a]ny other factors that tend to support or refute the opinion." *Id.*

Here, Palmer saw therapists at Hopewell Center from mid-2008 through at least March 2011. Though the dates are sometimes obscured or illegible, the record shows at least 33 visits. (*See* L.F., pp. 401–11, 486, 536–41, 601–09, 625–27, 636–44, 676–81.) Rice assessed how Palmer's depression affected her ability

to do work-related activities on January 26, 2011, after she and her Hopewell colleagues – including Dr. Krojanker, a treating psychiatrist – had seen Palmer monthly for more than two years. *See Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006) (discussing *Shontos*, 328 F.3d at 426–27) (where a "treatment team" included a psychologist, the whole team was entitled to "treating-source status"). Irwin, for his part, assigned a GAF score of 50 on January 4, 2010, after Palmer had been seeing him and his colleagues for almost 18 months. The score was consistent with other assigned GAF score by Hopewell staff.

Yet the ALJ only wrote that he gave Irwin's GAF score and Rice's opinions "little weight." The ALJ gave no reasoning for his decision. By way of explanation, he wrote that Irwin and Rice were not acceptable medical sources, so their opinions were "entitled to significantly less weight than an acceptable medical source opinion." As described above, this is a misstatement of the law. *See Sloan*, 499 F.3d at 889–90 (listing factors to be considered when weighing opinions from other medical sources; remanding case where ALJ "summarily dismissed" records and recommendations from claimant's social workers "simply because they were too low on the pecking order as he understood it to exist"); *Duncan v. Barnhart*, 368 F.3d 820 (8th Cir. 2004) ("an ALJ is not free to disregard the opinions of mental health providers simply because they are not medical doctors").

Because the ALJ applied the wrong standard, I will remand for the ALJ to weigh Rice's opinions and Irwin's GAF score using the factors required for other medical sources. I note, however, that Irwin gave little information on his medical source statement other than assigning a GAF score, and an ALJ may properly "afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." *Jones v. Astrue*, 619 F.3d 963, 974 (8th Cir. 2010); *see also id.* at 974 n.4.

<u>Opinions of Medical Expert Winkler and Treating Doctor McCrary Smith</u>

Palmer also argues that the ALJ improperly discounted the opinions of her treating sources and improperly gave great weight to the opinion of the medical expert. The ALJ only discounted the opinion of one treating source, Dr. McCrary Smith. He articulated a host of reasons for discounting her opinion, *see* L.F., p. 18, which are more than sufficient to support his determination. *See Perkins v. Astrue*, 648 F.3d 892, 897–98 (8th Cir. 2011).

Further, it is true that the opinions of a non-examining physician ordinarily do not constitute substantial evidence alone. *Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002). But the ALJ was entitled to "ask for and consider opinions from medical experts" and to evaluate them as he would other medical opinions. 20 C.F.R. § 404.1527(e)(2)(iii). In this case, there was substantial other evidence in the record to support the opinions of medical expert Winkler as to Palmer's

RFC, including some physical examinations showing Palmer had a normal gait; was able to ambulate independently; and was not functionally restricted by her treating doctors. *See Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001) (ALJ may credit the opinion of non-examining expert over treating physician's opinion if "supported by superior medical evidence").

The ALJ was entitled to give great weight to the opinion of Dr. Winkler and to discount the opinion of Dr. McCrary Smith. On remand, however, he should reconsider the weight he gave to their opinions in light of his findings on Palmer's muscle pain.

## D. *Conclusion*

Because the ALJ's findings as to Palmer's muscle pain were insufficient under 42 U.S.C. § 405(g) and because the ALJ applied the wrong legal standard in weighing the opinions of Palmer's therapists, I reverse and remand pursuant to sentence four of Section 405(g) for further proceedings consistent with this order. *See Scott ex rel. Scott v. Astrue*; 529 F.3d 818, 822 (8th Cir. 2008); *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997).

On remand, the Commissioner will also have the opportunity to reassess Palmer's credibility and reweigh the opinions of Palmer's treating doctors and the medical expert in light of the findings about Palmer's muscle pain.

Accordingly,

**IT IS HEREBY ORDERED** that that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this __22nd__ day of July, 2013.